1   Thomas F. Smegal, Jr. (CSB # 34,819)
    Irfan A. Lateef (CSB #204,004)
2   KNOBBE, MARTENS, OLSON & BEAR, LLP
    201 California Street, Suite 1150
3   San Francisco, CA  94111
    Telephone (415) 954-4114
4   Facsimile (415) 954-4111

5   Attorneys for Defendants,
    NALGE NUNC INTERNATIONAL CORPORATION
6   and APOGENT TECHNOLOGIES, INC.

7

8                  IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11

12  CALIFORNIA PACIFIC LABS, INC., a          ) Civil Action No. C-02-1418-JF (PVT)
    California corporation,                   )
13                                            ) **DEFENDANTS' NOTICE OF**
                        Plaintiff,            ) **MOTION AND MOTION FOR**
14                                            ) **SUMMARY JUDGMENT**
                  v.                          ) **DISMISSING PLAINTIFF'S**
15                                            ) **TRADE DRESS, BREACH OF**
    NALGE NUNC INTERNATIONAL                  ) **CONTRACT, AND TRADE**
16  CORPORATION, a Delaware corporation;      ) **SECRET MISAPPROPRIATION**
    and APOGENT TECHNOLOGIES, INC.,           ) **CLAIMS**
17                                            )
                        Defendants.           ) Date:  June 2, 2003
18  _____  ) Time:  9:00 a.m.
                                              ) Ctrm:  3, 5th Floor
19
                                                The Honorable Jeremy Fogel
20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

Page #s

3  I.    INTRODUCTION .................................................................................................1

4  II.   UNDISPUTED FACTS........................................................................................2

5        A.   Cal Labs Initially Offered to Supply Nalge with Its "Eco-Funnel"..................2

6        B.   Cal Labs Adopted Nalge's Design Concepts for the Phase II Funnel...............2

7        C.   Cal Labs and Nalge Enter Into a Purchase Order .............................................3

8        D.   Nalge Begins Selling Its Own Funnel ...............................................................4

9        E.   Cal Labs Does Not Label The Phase II Funnel .................................................4

10 III.  SUMMARY JUDGMENT IS APPROPRIATE............................................................5

11 IV.   NALGE DID NOT BREACH ANY CONTRACT ........................................................5

12       A.   Term Sheet Is Not a Valid Contract ..................................................................6

13       B.   In the Alternative, Nalge's Purchase Order Constitutes a
            Novation Terminating the Term Sheet ...............................................................7
14
         C.   Nalge Did not Beach Any Confidentiality Agreement.......................................9
15
   V.    CAL LABS HAS NO TRADE DRESS RIGHTS .........................................................9
16
         A.   The Phase II Funnel Is Functional .....................................................................9
17
              1.   Cal Labs' Website, Declarants, and Patent Tout the
18                 Utilitarian Advantages of the Phase II Funnel Design ........................11

19            2.   Cal Labs Has Failed to Show Feasible Alternative
                   Designs ................................................................................................13
20
         B.   The Phase II Funnel Lacks Any Secondary Meaning......................................14
21
         C.   The Phase II Funnel Is Not Likely to Be Confused With
22            Nalge's Nalgene® Safety Waste Funnel (Phase III) .......................................16

23 VI.   CAL LABS HAS NO PROTECTABLE TRADE SECRETS......................................18

24       A.   Many of Cal Labs' Alleged Trade Secrets Are in the
              Public Domain ..................................................................................................19
25
         B.   Cal Labs Cannot Prove That It Has Any Protectable
26            Trade Secrets ....................................................................................................21

27 VII.  CONCLUSION.....................................................................................................21

28

1

# **TABLE OF AUTHORITIES**

2

<u>Page #s</u>

3

*Acuson Corp. v. Aloka Co.,*
  257 Cal. Rptr. 368 (Cal. App. 1989)..........................................................................20

4

*Airs Int'l, Inc. v. Perfect Scents Distrib., Ltd.,*
5
  902 F. Supp. 1141 (N.D. Cal. 1995)........................................................................7, 8

6

*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986)........................................................................................................5

7

*Banco do Brasil, S.A. v. Latian, Inc.,*
8
  285 Cal. Rptr. 870 (Cal. App. 1991).............................................................................8

9

*Bleecher v. Conte,*
  698 P.2d 1154 (Cal. 1981)...........................................................................................6, 7

10

*Bose Corp. v. Linear Design Labs, Inc.,*
11
  467 F.2d at 304 (2d Cir. 1972) ...................................................................................17

12

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)........................................................................................................5

13

*Chodos v. W. Publ'g Co.,*
14
  292 F.3d 992 (9th Cir. 2002) .........................................................................................6

15

*Clicks Billiards, Inc. v. Sixshooters, Inc.,*
  251 F.3d 1252 (9th Cir. 2001) .................................................................................9, 16

16

*Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,*
17
  158 F.3d 1002 (9th Cir. 1998) .............................................................9, 10, 11, 13, 14

18

*First Brands Corp. v. Fred Meyer, Inc.,*
  809 F.2d 1378 (9th Cir. 1987).................................................................................12, 16

19

*Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,*
20
  626 F.2d 193 (1st Cir. 1980)....................................................................................17, 18

21

*HWE, Inc. v. JB Research, Inc.,*
  993 F.2d 694 (9th Cir. 1993) .........................................................................................9

22

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.,*
23
  4 F.3d 819 (9th Cir. 1993) ...................................................................................9, 14, 16

24

*Kewanee Oil Co. v. Bicron Corp.,*
  416 U.S. 470, 94 S. Ct. 1879 (1974)............................................................................18

25

*Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.,*
26
  199 F.3d 1009 (9th Cir. 1999) .............................................................10, 12, 13, 14, 17

27

*Levi Strauss & Co. v. Blue Bell, Inc.,*
  778 F.2d 1352 (9th Cir. 1985) .....................................................................................14

28

1

## TABLE OF AUTHORITIES
### (Cont'd.)

Page #s

2

3

*MAI Sys. Corp. v. Peak Computer, Inc.,*
   991 F.2d 511 (9th Cir. 1993) .......................................................................... 18, 19, 21

4

*Mattei v. Hopper,*
   330 P.2d 625 (Cal. 1958) .......................................................................................... 7

5

6

*In re Morton-Norwich Prods., Inc.,*
   671 F.2d 1332 (C.C.P.A. 1982) .............................................................................. 10

7

*Petersen Mfg. Co. v. Cent. Purchasing, Inc.,*
   740 F.2d 1541 (Fed. Cir. 1984) .............................................................................. 13

8

9

*Qualitex Co. v. Jacobson Prods. Co.,*
   514 U.S. 159 (1995).................................................................................................. 10

10

*Rachel v. Banana Republic, Inc.,*
   831 F.2d 1503 (9th Cir. 1987) ........................................................................... 10, 16

11

12

*Religious Tech. Ctr. v. Netcom On-Line Comm. Serv., Inc.,*
   923 F. Supp. 1231 (N.D. Cal. 1995) ....................................................................... 21

13

14

*Rototron Corp. v. Lake Shore Burial Vault Co.,*
   712 F.2d 1214 (7th Cir. 1983) ................................................................................. 20

15

*STX, Inc. v. Bauer USA,*
   43 U.S.P.Q. 2d 1492, 1997 U.S. Dist. LEXIS 16250 (N.D. Cal. 1997) .................. 16

16

*Schimmel v. Martin,*
   190 Cal. 429 (Cal. 1923) ........................................................................................... 7

17

18

*Scott v. Cline Elec. Mfg. Co.,*
   285 P. 349 (Cal. App. 1930) ..................................................................................... 6

19

20

*Sears, Roebuck & Co. v. Stiffel Co.,*
   376 U.S. 225 (1964).................................................................................................. 17

21

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization,*
   59 F.3d 902 (9th Cir. 1995) ..................................................................................... 15

22

23

*Stilwell Dev., Inc. v. Chen,*
   11 U.S.P.Q. 2d 1328, 1989 U.S. Dist. LEXIS 5971 (C.D. Cal. 1989) .................... 20

24

*Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.,*
   909 F. Supp. 1353 (C.D. Cal. 1995) ........................................................................ 20

25

26

*Sunbeam Corp. v. Equity Indus. Corp.,*
   635 F. Supp. 625 (E.D. Va. 1986) ........................................................................... 18

27

*Tie Tech, Inc. v. Kinedyne Corp.,*
   296 F.3d 778 (9th Cir. 2002) .............................................................................. 9, 10

28

**TABLE OF AUTHORITIES**
(Cont'd.)

Page #s

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.,*
    532 U.S. 23, 121 S. Ct. 1255 (2001)............................................................ 13

*Tveter v. Ab Turn-o-Matic,*
    633 F.2d 831 (9th Cir. 1980) .................................................................... 17

*Two Pesos v. Taco Cabana,*
    505 U.S. 763 (1992)................................................................................... 9

*United States v. King Features Entm't, Inc.,*
    843 F.2d 394 (9th Cir. 1988) ..................................................................... 5

*Versa Prods. Co. v. Bifold Co.,*
    50 F.3d 189 (3d Cir. 1995) ....................................................................... 16

*VSL Corp. v. Gen. Techs., Inc.,*
    44 U.S.P.Q. 2d 1301, 1997 U.S. Dist. LEXIS 22457
    (N.D. Cal. July 21, 1997)......................................................................... 19

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.,*
    529 U.S. 205 (2000).........................................................................9, 14, 16

**OTHER AUTHORITIES**

Cal. Civ. Code § 3426.1.........................................................................18, 19

Fed. R. Civ. P. 56....................................................................................... 5

15 U.S.C. § 1125........................................................................................ 18

1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    § 8:14 (4th ed. 2002)............................................................................... 16

1 Roger M. Milgrim, *Milgrim on Trade Secrets*
    § 1.05[2] (2002) ......................................................................................20

2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    § 15:8 (4th ed. 2002)............................................................................... 14

15 *Williston on Contracts* § 1869 ...................................................................7

*Summary of Cal. Law Contracts*
    § 230 (9th ed. 1987)..................................................................................6

PLEASE TAKE NOTICE that Nalge Nunc International Corporation and Apogent Technologies, Inc. ("Defendants" or "Nalge") hereby move the United States District Court for the Northern District of California for Summary Judgment. This Motion is noticed to be heard before the Honorable Jeremy Fogel on Monday, June 2, 2003, at 9:00 a.m. in Courtroom 3 on the 5th Floor of the United States Courthouse, located at 280 S. First Street, San Jose, California 95113.

### RELIEF REQUESTED

Defendants request that the Court dismiss with prejudice the following claims made by Plaintiff:

1.    That Nalge infringes Plaintiff's alleged trade dress (Complaint ¶ ¶ 45-53 "First Cause of Action");

2.    That Nalge breached alleged contracts with Plaintiff (Complaint ¶ ¶ 97-102 "Ninth Cause of Action"); and

3.    That Nalge misappropriated Plaintiff's alleged trade secrets (Complaint ¶ ¶ 66-78 "Fourth Cause of Action").

## I.  INTRODUCTION

Defendants hereby submit this Memorandum of Points and Authorities in support of Defendants' Motion for Summary Judgment.

Nalge is being sued by California Pacific Labs ("Cal Labs") solely because Cal Labs contends that it competes with Cal Labs in the chemical funnel industry. In 1997, Nalge and Cal Labs collaborated to design, manufacture, and distribute a Phase II funnel identified as the Nalge Nalgene® Safety Waste Funnel.[1] Nalge ended that association in 1998 when Cal Labs' manufacturing quality became problematic. Nalge then independently developed a modified Nalgene® Safety Waste Funnel (the "Phase III funnel") which it manufactures and sells under its trademark Nalgene®.

/ / /

---

[1]    Cal Labs sells the Phase II funnel through four other distributors.

1   In 2002, Cal Labs filed suit contending that in manufacturing and selling its Phase III

2   funnel, Nalge copied the alleged trade dress of the Phase II funnel, misappropriated Cal Labs'

3   alleged trade secrets, and breached its alleged contracts with Cal Labs. These contentions,

4   however, are unsupported in fact or law and are merely an effort to drive out lawful

5   competition.   Accordingly, the Court should grant Defendants' Motion for Summary

6   Judgment.

7   ## II. <u>UNDISPUTED FACTS</u>

8   ### A.   <u>Cal Labs Initially Offered to Supply Nalge with Its "Eco-Funnel"</u>

9   For decades, Nalge has been in the business of making and selling hundreds of

10   laboratory products including funnels. Reagan Decl. ¶ 3. One type of funnel sold by Nalge is

11   the Nalgene® Safety Waste Funnel. *Id.* at 4. Nalge's funnel is a high-density polyethylene

12   funnel with a lid. *Id.* These funnels are functionally designed to reduce volatile emissions in

13   the laboratory.

14   In the fall of 1996, Cal Labs' representative, Dr. Ron Najafi, met and corresponded

15   with Nalge representatives for the purpose of pitching its publicly available "Eco-Funnel"

16   product. Lateef Decl. Ex. 3 ¶¶ 22-25 (Najafi's Decl. In Support of PI Motion). The Nalge

17   representatives had seen the "Eco-Funnel" displayed by Cal Labs at an earlier trade show. *Id.*

18   Ex. 3 at ¶ 22. At that time, the "Eco-Funnel" was completely white and included a ball

19   connected by a string to the recessed lid which was hingedly attached to a conical funnel that

20   Cal Labs sometimes refers to as the Phase I design. Lateef Decl. Ex. 2 at 46-48. This design

21   is partially the subject of U.S. Patent No. 5,515,892 ("the '852 patent") issued May 1996 to

22   Dr. Ron Najafi et al. entitled "Ecological Funnel." Lateef Decl. Ex. 1.

23   ### B.   <u>Cal Labs Adopted Nalge's Design Concepts for the Phase II Funnel</u>

24   Although Nalge was interested in selling a product supplied by Cal Labs, Nalge felt

25   that several substantial changes were necessary – including elimination of the ball and string

26   – for there to be a product which would have commercial acceptance. Lateef Decl. Ex. 4, p.

27   6, ll. 6-12. Nalge discussed with Cal Labs that a white bowl-shaped funnel accompanied by a

28   red lid would be a better product. Lateef Decl. Ex. 5 at 35:14-21. Nalge also suggested that a

1  bowl-shaped funnel – also described in the '892 patent – would provide less air trapping.

2  Reagan Decl. ¶¶ 6-8. Additionally, Nalge believed that a contrasting red lid would alert

3  users to when the lid was closed and that liquid should not then be poured into the funnel. *Id.*

4  Cal Labs agreed to revamp its Phase I design to conform to these suggestions. Cal Labs

5  sometimes refers to the redesigned "Eco-Funnel" as the "Phase II funnel."[2]

6  **C.    Cal Labs and Nalge Enter Into a Purchase Order**

7       On March 4, 1997, Cal Labs and Nalge agreed to a basic term sheet ("Term Sheet").

8  Lateef Decl. Ex. 6. Subsequently, the parties set quantities and price, and Nalge sent

9  Purchase Order #93505 dated August 13, 1997 (hereinafter "Purchase Order") (Reagan Decl.

10 Ex. 3) to Cal Labs for 10,500 Phase II funnels to be sold as the Nalgene® Safety Water

11 Funnel. The Purchase Order set forth the "Terms of Sale," which in relevant part were:

12       11.  Buyer and Seller agree that the Terms and Conditions contained herein
13       shall prevail over any other inconsistent Terms and Conditions.

14       12.  ENTIRE AGREEMENT.  This Purchase Order contains the <u>entire</u>
     <u>agreement</u> of Nalge and the Seller, and incorporates terms and conditions
15   governing the sale. It is to be accepted only on those terms; no contrary or
     additional terms in any acknowledgement, invoice, or correspondence of
16   Seller will be part of any contract of sale between Nalge and Seller unless
     specifically accepted and made a part hereof by written acknowledgement
17   from Nalge. <u>Modification or amendment to this Purchase Order can only be</u>
     <u>made by a written memorandum, signed by both parties.</u>

18 Reagan Decl. Ex. 3 at 3 (emphasis added). On September 23, 1997, Cal Labs sent Nalge

19 Invoice No. 890 which referenced and ratified the Purchase Order. Reagan Decl. Ex. 4.

20 Thus, the Purchase Order became the "entire agreement" between Nalge and Cal Labs.

21       In late 1997, Nalge received and began selling the Phase II funnel being supplied

22 under the Purchase Order as the Nalgene® Safety Waste Funnel (Catalog No. 6375). Reagan

23 / / /

24 / / /

25 / / /

26

27       [2]    For clarity, hereafter the redesigned "Eco-Funnel" will be referred to by the
28 "Phase II funnel" designation adopted by Cal Labs.

Decl. ¶ 9. The Nalgene® Safety Waste Funnel (Catalog No. 6375) was clearly labeled as the "Nalgene® Safety Waste Funnel":



*Id.* In fact, Cal Labs encouraged Nalge to mark its products as such. Lateef Decl. Ex. 5 at 24:14-15.

Nalge paid in full for all the funnels specified in the Purchase Order. Reagan Decl. ¶ 12, Ex. 5. In a July 13, 1998 teleconference with Cal Labs, Nalge confirmed that there would be no further funnel purchases from Cal Labs beyond those agreed to in the Purchase Order. *Id*; *Id.* at Ex. 9.

**D.  Nalge Begins Selling Its Own Funnel**

Subsequent to terminating its relationship with Cal Labs, in 1998, Nalge developed its own funnel sold as the Nalgene® Safety Waste Funnel (Catalog No. 6378).[3]  Reagan Decl. ¶ 14. The Phase III funnel looks very different from the Phase II funnel. Among the most obvious structural differences are that the redesigned Phase III funnel has a filter device projecting from the funnel neck and has a much shorter stem than that of the Phase II funnel. *Compare* Reagan Exs. 6 and 7.

**E.  Cal Labs Does Not Label The Phase II Funnel**

According to Cal Labs, the Phase II funnel is distributed by four other companies: Lab Safety Supply, Aldrich Chemical Co., Chemglass, Inc., and VWR International. Lateef Decl. Ex. 5 at 49:08-19 and Ex. 11. Importantly, Dr. Najafi has confirmed that none of the

---

[3]     For ease of reference, the Nalgene® Safety Waste Funnel (Catalog No. 6378) will be referred to as the Phase III funnel.

1   Phase II funnels distributed by these companies is <u>marked</u> with a "California Pacific Labs"

2   label, nor with the words "Eco-Funnel." <u>Id</u>. Ex. 5 at 45:25-46:12 and 50:12-15. Purchasers

3   are left to identify the source of the product, if at all, solely by the particular distributor from

4   which the Phase II funnel is purchased – not with Cal Labs nor even as an "Eco-Funnel."

5   Thus, the Phase II funnel product is completely generic.

6   ### III.  SUMMARY JUDGMENT IS APPROPRIATE

7   Summary judgment must be granted when the evidence of record raises no genuine

8   issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.

9   Civ. P. 56(c).  "[T]his standard provides that the mere existence of *some* alleged factual

10  dispute between the parties will not defeat an otherwise properly supported motion for

11  summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

12  *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986).  Importantly, "the plain language of

13  Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a

14  showing sufficient to establish the existence of an element essential to that party's case, and

15  on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

16  317, 322 (1986).

17  ### IV.  NALGE DID NOT BREACH ANY CONTRACT

18  Cal Labs alleges that Nalge breached a Term Sheet by "failing to order, sell, and

19  distribute the 'Eco-Funnel,'" (Complaint ¶ 98, Ex. C; or Lateef Decl. Ex. 6)[4] and a

20  confidentiality agreement (Complaint Exs. A and B; or Lateef Decl. Ex. 8) by "failing to

21  maintain the secrecy of plaintiff's customer list, marketing strategy, and other proprietary

22  information"  (Complaint ¶ 100).  In contract cases, "[s]ummary judgment is appropriate

23  when the contract terms are clear and unambiguous, even if the parties disagree as to their

24  meaning." *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 398 (9th Cir. 1988).

25  / / /

26

27      [4]      There was never any agreement, written or otherwise, that required Nalge to
28  order, sell, and distribute the Phase I funnel.

1   Additionally, "[i]nterpretation of a contract is a matter of law, including whether the contract

2   is ambiguous." *Id.* Obviously, Cal Labs bears the burden of proving any breach of contract.

3       Here, Cal Labs cannot meet its burden because the Term Sheet was not a valid

4   contract, and, consequently, there was no contract for Nalge to breach. Further, the items Cal

5   Labs alleges Nalge disclosed in violation of the confidentiality agreement were either already

6   in the public domain or are unsupported by any evidence of a breach of confidence by Nalge.

7   Therefore, summary judgment is appropriate.

8   **A.    Term Sheet Is Not a Valid Contract**

9       "[I]n order for a contract to be enforceable under California law, it must impose

10  binding obligations on each party." *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 996 (9th Cir.

11  2002). However, a proposal by one party to furnish all of the goods of a certain kind at a

12  specified price that another may "want" or "desire" during a certain period is considered an

13  illusory offer which does not, upon acceptance, result in an enforceable contract. 1 Witkin,

14  *Summary of Cal. Law Contracts* § 230 (9th ed. 1987).

15      Under the March 4, 1997 Term Sheet, Nalge was under no obligation to perform or

16  compensate Cal Labs. Cal Labs "agree[d] to supply [Nalge] with 3 ECO funnel designs made

17  of HDPE" and "guaranteed unit quantities" for the first three years. Lateef Decl. Ex. 6 ¶¶ 1,

18  3. Nalge, however, agreed only "to supply [Cal Labs] with sales quantity *forecasts* for ECO

19  funnels" and for "notice of discontinuation." *Id.* ¶¶ 2, 5 (emphasis added). Significantly,

20  under the Term Sheet, Nalge could give a sales quantity forecast of zero and not have to

21  purchase any funnels.

22      "If a party is not assuming a legal duty in making a promise, the agreement is not

23  binding as a bilateral contract . . . . [F]or the contract to bind either party, both must have

24  assumed some legal obligations." *Bleecher v. Conte*, 698 P.2d 1154, 1156 (Cal. 1981). Here,

25  Nalge had no legal obligation to purchase any funnels or otherwise perform. Thus, Nalge's

26  obligation was illusory and, consequently, the Term Sheet is not a valid, enforceable contract.

27  *See, e.g., Scott v. Cline Elec. Mfg. Co.*, 285 P. 349 (Cal. App. 1930) (no enforceable contract

28  where plaintiff agreed only to "push the sale" of defendant's motors not to buy anything of

1   defendant); *Schimmel v. Martin*, 190 Cal. 429 (Cal. 1923) (no contract where no obligation or

2   promise on the part of plaintiffs to take or purchase any water at all); *see also Bleecher*, 698

3   P.2d 1154 (Cal. 1981); *Mattei v. Hopper*, 330 P.2d 625 (Cal. 1958).

4   **B.   <u>In the Alternative, Nalge's Purchase Order Constitutes a Novation Terminating</u>**

5   **<u>the Term Sheet</u>**

6   Furthermore, even if the Term Sheet were to be considered a valid contract, the

7   Purchase Order constituted a novation between Nalge and Cal Labs - - terminating any legal

8   significance of the Term Sheet as of September 23, 1997 - - when Cal Labs sent its invoice

9   requesting payment of the Purchase Order.

10   "Novation is the substitution of a new obligation for an existing one . . . . In every

11   novation, there are four essential requisites: First, a previous valid obligation; second, the

12   agreement of all the parties to the new contract; third, the extinguishment of the old contract;

13   and fourth, the validity of the new one." *Airs Int'l, Inc. v. Perfect Scents Distrib., Ltd.*, 902 F.

14   Supp. 1141, 1147 (N.D. Cal. 1995) (citing 15 *Williston on Contracts* § 1869).

15   Only for the purpose of this argument made in the alternative, it will be assumed that

16   the Term Sheet was a previous, valid obligation. Hence, the first requirement of a novation is

17   met. *Id.*

18   The second and fourth requirements are that the parties must agree to a new, valid

19   contract supported by consideration. *Id.* These requirements are clearly met here. Purchase

20   Order No. 93505 dated August 13, 1997 represents Nalge's offer. Reagan Decl. Ex. 3. The

21   terms of the offer were that Nalge would pay $454,160 for 10,500 funnels. *Id.* Cal Labs

22   accepted Nalge's offer as evidenced by its Invoice dated September 23, 1997 specifically

23   referencing Nalge's Purchase Order and seeking payment of the full contract price. Reagan

24   Decl. Ex. 4. In consideration for the 1800 funnels to be supplied that day plus additional

25   funnels to be delivered later, Nalge <u>advanced</u> Cal Labs $77,586. *Id.* Accordingly, there was

26   a new contract supported by consideration, satisfying the second requirement, and the

27   contract was valid, satisfying the fourth requirement. *Airs Int'l*, 902 F. Supp. at 1147.

28   ///

1    The third requirement is that the old contract must be extinguished. This is clear

2    based on the unambiguous and comprehensive merger clause contained in the agreed upon

3    Purchase Order, as set forth in Section II.C., *supra*. Reagan Decl. Ex. 3 at 3, ¶ 12.

4         The crucial issue is whether the parties intended the written instrument to
         serve as the exclusive embodiment of their agreement. "The instrument itself
5         may help to resolve that issue. It may state, for example, that 'there are no
         previous understandings or agreements not contained in the writing,' and thus
6         express the parties' intention to nullify antecedent understandings or
         agreements'." Indeed, if such a clause is adopted and used by the parties, it
7         may well be conclusive on the issue of integration.

8    *Banco do Brasil, S.A. v. Latian, Inc.*, 285 Cal. Rptr. 870, 883 (Cal. App. 1991) (citations

9    omitted). Here, as in *Banco do Brasil*, the writing-in-question "leaves no doubt that it is

10   complete and was intended by the parties to be a complete expression of their understanding."

11   *Id.* at 887 (where merger clause read: "This Agreement together with exhibits attached

12   hereto, embodies the entire agreement and understanding among the parties hereto and

13   supersedes all prior agreements and understandings relating to the subject matter hereof.").

14   *See also Airs Int'l*, 902 F. Supp. at 1143-44 (conclusive as to intent to embody entire

15   agreement where merger clause read: "[T]his agreement supersedes any and all other

16   agreements, either oral or in writing, between the parties hereto and contains all of the

17   covenants and agreements between the parties."). Accordingly, the Purchase Order, and the

18   Invoice confirming acceptance of the Purchase Order, extinguished the Term Sheet.

19       Thus, even if the Term Sheet were considered a valid contract (which it is not), the

20   four requirements of a novation are met, by the Nalge Purchase Order and the Cal Labs

21   Invoice. "Where there has been a novation, the rights and duties of the parties must be

22   governed by the new agreement alone, and a failure to perform (thereunder) does not, under

23   any theory of rescission or revivor, operate to breathe new life into the dead and extinguished

24   obligation." *Id.* at 1147 (internal quotation marks and citation omitted). Consequently, even

25   if Nalge breached the Term Sheet, which it did not, that contract, if ever valid, was no longer

26   in existence once Cal Labs provided its written acceptance of the Purchase Order.

27       Accordingly, Cal Labs cannot prevail on its claim for breach of contract and summary

28   judgment should be granted in favor of Nalge.

**C.     Nalge Did not Beach Any Confidentiality Agreement**

The issue of whether Nalge breached the confidentiality agreement is dependent upon whether Cal Labs has any alleged trade secrets that are in fact protectable as trade secrets. This issue is addressed in Section VI, *infra*, on Trade Secrets.

**V. <u>CAL LABS HAS NO TRADE DRESS RIGHTS</u>**

Summary judgment is appropriate in a trade dress case. *See Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998) (summary judgment granted since no genuine issue of fact as to functionality of trade dress); *HWE, Inc. v. JB Research, Inc.*, 993 F.2d 694 (9th Cir. 1993) (summary judgment granted since no evidence that trade dress was non-functional or had secondary meaning); *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778 (9th Cir. 2002) (summary judgment granted since trade dress was functional and not protectable).

Cal Labs contends that Nalge infringed the trade dress of the Phase II funnel by manufacture of the Phase III funnel, sold by Nalge as the Nalgene® Safety Waste Funnel. Complaint ¶ 47. Yet, Cal Labs cannot demonstrate that, or even create a material issue of fact, as to whether the Phase II funnel design is non-functional or has acquired secondary meaning. Therefore, summary judgment for Nalge is appropriate with respect to Cal Labs' trade dress infringement claim.

Cal Labs has the burden of proving it has a protectable trade dress and that its trade dress: (1) is non-functional; (2) has acquired secondary meaning; and (3) is likely to be confused with Nalge's Phase III funnel by members of the consuming public. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209 (2000); *Two Pesos v. Taco Cabana*, 505 U.S. 763 (1992); *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257-58 (9th Cir. 2001); *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir. 1993). Cal Labs, however, cannot meet this burden.

**A.     <u>The Phase II Funnel Is Functional</u>**

Only <u>non-functional</u> aspects of a product may be protected as trade dress. *Disc Golf*, 158 F.3d at 1006. "The requirement of nonfunctionality is based 'on the judicial theory that

1   there exists a fundamental right to compete through the imitation of a competitor's product,

2   which right can only be *temporarily* denied by the patent or copyright laws.'" *Leatherman*

3   *Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1011-12 (9th Cir. 1999) (quoting *In re*

4   *Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1336 (C.C.P.A. 1982) (emphasis in original)).

5   Thus, only patent laws can protect the utilitarian aspects of a product's configuration. *Id.* at

6   1012.

7        A product feature is functional "if it is essential to the use or purpose of the article or

8   if it affects the cost or quality of the article, that is, if exclusive use of the feature would put

9   competitors at a significant non-reputation-related disadvantage." *Disc Golf*, 158 F.3d at

10  1006 (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995) (internal

11  quotation marks and citation omitted)).   The Ninth Circuit has observed that "functional

12  features of a product are features which constitute the actual benefit that the consumer wishes

13  to purchase, as distinguished from an assurance that a particular entity made, sponsored, or

14  endorsed a product." *Id.* (quoting *Rachel v. Banana Republic*, 831 F.2d 1503, 1506 (9th Cir.

15  1987)).  Thus, "the right to copy better working designs would, in due course, be stripped of

16  all meaning if overall functional designs were accorded trademark protection because they

17  included a few arbitrary and nonfunctional features." *Leatherman*, 199 F.3d at 1012 (citation

18  omitted).  In other words, "the entire design must be non-functional" – a few arbitrary and

19  non-functional features do not undermine the overall functionality of a design. *Id.*

20       To determine whether the Phase II funnel is functional, several factors are considered,

21  such as, "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs

22  are available, [and] (3) whether advertising touts the utilitarian advantages of the design."

23  *Disc Golf*, 158 F.3d at 1006. Here, Cal Labs asserts that its Phase II funnel enjoys trade dress

24  protection in its color, shape, and overall "look and feel," particularly emphasizing the red lid,

25  the indentation of the lid, and its bowl shape.  Yet, Cal Labs has not identified how these

26  broad elements are not de jure functional. *See Tie Tech*, 296 F.3d 778. "De jure functionality

27  . . . means that the product is in its particular shape because it works better in this shape . . . .

28  [B]efore an overall product configuration can be recognized as a trademark, the entire design

1 must be arbitrary or non de jure functional." *Leatherman*, 199 F.3d at 1012. It is quite clear
2 that purchasers obtain the Phase II funnel for the functional benefits of its color and overall
3 shape and not because these features are arbitrary embellishments that identify Cal Labs as
4 the supplier of the Phase II funnel.

5      1.   **Cal Labs' Website, Declarants, and Patent Tout the Utilitarian**
6         **Advantages of the Phase II Funnel Design**

7     Advertising of the utilitarian advantages of a design is strong evidence of
8 functionality. *Disc Golf*, 158 F.3d at 1009. These advantages may be implied from the
9 advertisements as a whole. *Id.* Here, the only features of the Phase II funnel ever discussed
10 are utilitarian and Cal Labs has failed to offer any evidence otherwise.

11     On its website, Cal Labs boasts that its Phase II funnel "is more than a funnel with a
12 cover . . . It is specially designed to prevent emission of solvent fumes from open top and
13 uncapped satellite waste bottles and carboys." Lateef Decl. Ex. 7 at 2. Tellingly, the website
14 proclaims that "[t]he primary <u>function</u> of ECO FUNNEL is to reduce the emission of volatile
15 solvent to near zero, while providing a measure of convenience in handling temporary waste
16 in the lab." *Id.* at 3 (emphasis added).

17     Cal Labs' own president, Dr. Najafi, also touts the utilitarian aspects of the Phase II
18 funnel. For example, Dr. Najafi notes the advantages of the "Eco-Funnel's" design by
19 explaining that "[t]he Eco-Funnel [has] the advantage of having a closed system funnel that
20 has a cap with an easy to open lid." Lateef Decl. Ex. 3 ¶ 9 . "The advantage of the Eco-
21 Funnel is that it does not trap air in the bottle, hence causing what is commonly called 'air
22 trapping' and subsequent 'splashing' of the solvent." *Id.* Additionally, he states the design
23 "remedied" the evaporation of solvents, which makes fires less likely. Lateef Decl. Ex. 5 at
24 13:10-15 Thus, the Phase II funnel was created to address the "problems of open-waste
25 containers and solutions emitted from them." Lateef Decl. Ex. 3 ¶ 13. Finally, even the ball
26 present in the Phase I design was eliminated for functionality reasons. Dr. Najafi stated that it
27 was removed because "customers were having difficulty with the ball . . . mechanical
28 problems . . . ." Lateef Decl. Ex. 5 at 35:18-21.

1    Declarants retained by Cal Labs to support their withdrawn Motion for Preliminary

2 Injunction ("PI Motion") also agree.  Dr. Jalali notes that "[t]he Eco-Funnel is an important

3 scientific achievement given the health benefits conferred by its unique design which includes

4 its color, shape, angles, and overall look and feel."  Lateef Decl. Ex. 9 ¶¶ 6-8.  *See also* Lateef

5 Decl. Ex. 10 ¶ 10 ("The Eco-Funnel's health and safety features are, in my opinion, a positive

6 achievement potentially contributing to the longevity of laboratory scientists."); Lateef Decl.

7 Ex. 11 ¶ 8 (the "Eco-Funnel" is "respected" for "its health and safety benefits.").  Thus, it is

8 clear that the color and the shape are sought for their utilitarian benefits by each of Dr.

9 Najafi's friends and associates.  Finally, during the deposition of Dr. Jalali, Dr. Jalali

10 explained, in no uncertain terms, that the Phase II funnel, including its color and shape, was

11 "functional."  Lateef Decl. Ex. 12 at 22:12-24:14, 26:15-23, 27:7-16.  The bowl shape of the

12 funnel allows for more volume to be funneled and the indented lid both serve functional

13 purposes.  Reagan Decl. ¶¶ 7-8.

14    Although Cal Labs' PI Motion asserted that the Phase II funnel "color has nothing

15 whatsoever to do with its functionality," the color red is recommended by the Federal

16 Government as an accident prevention indicator for "danger."  *See* Reagan Decl. ¶ 6 and Ex.

17 2 thereto.  Cal Labs' attempt to monopolize the color red should also be rejected because it

18 was suggested by Nalge.  *See First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1382-

19 83 (9th Cir. 1987) (color-depletion theory directs courts to be extremely cautious in granting

20 trade dress in a primary color because to do so would deprive the marketplace of competitive

21 need).

22    Further, Cal Labs has asserted that the vague "look and feel" as well as the "overall

23 appearance" of the Phase II funnel is part of its trade dress viewed as a whole.  However,

24 "where the whole is nothing other than the assemblage of functional parts, and where even

25 the arrangement and combination of the parts is designed to result in superior performance, it

26 is semantic trickery to say that there is still some sort of separate 'overall appearance' which

27 is non-functional."  *Leatherman*, 199 F.3d at 1013 (emphasis added).  This is the case here.

28 Cal Labs has failed to identify any feature of the Phase II funnel which is ornamental or

1 intended to identify its source. *Id.* It has failed to show that the Phase II funnel is anything

2 but de jure functional. Indeed, every part of the Phase II funnel is clearly functional. *See*

3 *Disc Golf*, 158 F.3d at 1006.

4       Finally, a utility patent is "strong evidence" that the features therein are functional.

5 *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29, 121 S. Ct. 1255 (2001).   As

6 mentioned above, the '892 patent, issued May 14, 1996, to Dr. Najafi et al. is entitled

7 "Ecological Funnel." Lateef Decl. Ex. 1. Among the features discussed in its patent is a

8 funnel with a lid. *Id.* at Abstract, col. 2:25-29, Figs. 2A-5A. Additionally, the patent

9 acknowledges that "the body of the funnel can have generally parallel sides with a tapered

10 bottom" giving the funnel a bowl-ish shape. *Id.* at col. 8:2-4. Interestingly, in the

11 prosecution history of the patent application from which the '892 patent issued, several prior

12 art references illustrate a funnel with a lid (dated 1898) as well as bowl-shaped funnels. *See*

13 Lateef Decl. Ex. 1 at col. 2:25-29, Ex. 2 at 39-40, Ex. 14 at 1, 4, 8.

14       In addition, the Phase II funnel design yields utilitarian advantages that is shown on a

15 website declarant's tout. It has a particular shape and color because it works better that way.

16 *See Leatherman*, 199 F.3d at 1013. Where, as here, the overall design is functional, even the

17 presence of "some arbitrary features" would not defeat the establishment of non-functionality.

18 *Petersen Mfg. Co. v. Cent. Purchasing, Inc.*, 740 F.2d 1541, 1550 (Fed. Cir. 1984).

19       **2.    Cal Labs Has Failed to Show Feasible Alternative Designs**

20       The existence of available, alternative designs must be proven – mere speculation or a

21 theoretical possibility is insufficient. *Id.* Cal Labs has failed to demonstrate any feasible

22 alternative design. *See Disc Golf*, 158 F.3d at 1006. Moreover, the functionality of a product

23 cannot be overcome by a showing of alternative designs. *Leatherman*, 199 F.3d at 1014;

24 *TrafFix*, 532 U.S. at 33-34, 121 S. Ct. at 1262 ("Functionality having been established . . .

25 [t]here is no need . . . to . . . speculat[e] about other design possibilities.").

26       Cal Labs has referenced fifteen alleged design alternatives. *See* Lateef Decl. Ex. 13 at

27 8:03-9:06. Cal Labs, however, goes on to state that "[n]one of the alternative designs to the

28 Eco-Funnel provides the *same advantages* as the Eco-Funnel." *Id.* at 7:13-14 (emphasis

added).  Yet, Cal Labs "does not have rights under trade dress law to compel its competitors to resort to alternative designs which have *a different set of advantages and disadvantages*. Such is the realm of patent law."  *Leatherman*, 199 F.3d at 1014 n.7 (emphasis added). Accordingly, Cal Labs has <u>admitted</u> that the Phase II funnel is functional by contending that design alternatives do not perform (i.e. function) as well.  *Id.*

Additionally, a functional benefit may arise if "the design achieves economies in manufacture or use."  *Disc Golf*, 158 F.3d at 1009 (citation omitted).  Cal Labs has the burden of proof to establish that the Phase II funnel was not relatively simple or inexpensive to manufacture so as not to be a functional benefit.  *Id.*  Cal Labs, however, cannot establish any proof regarding this factor.

## B.   <u>The Phase II Funnel Lacks Any Secondary Meaning</u>

Cal Labs also bears the burden of proving that the Phase II funnel has acquired distinctiveness or "secondary meaning."[5]  *Int'l Jensen*, 4 F.3d at 824.  Secondary meaning is defined as the public's association of a particular trademark or trade dress with a <u>single source</u>.  2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 15:8 (4th ed. 2002).  Thus, secondary meaning exists, when, "in the minds of the public, the primary <u>significance of a [design] is to identify the **source** of the product</u> rather than the product itself."  *Wal-Mart*, 529 U.S. at 211 (emphasis added).  "[I]n an action for infringement of unregistered trade dress . . . a product's design is distinctive, and therefore protectable, only upon a showing of secondary meaning."  *Id.* at 216.  Cal Labs has the burden of showing that the Phase II funnel design obtained secondary meaning <u>before</u> Nalge commenced its allegedly infringing activities, i.e., before Nalge commenced sales of the Phase III funnel in 1999.  *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985) (*en banc*).

/ / /

/ / /

---

[5]      Cal Labs has <u>no</u> <u>trademark</u> <u>registrations</u> for either the Phase I or Phase II funnels' alleged trade dress.

1    Cal Labs has failed, however, to present any objective evidence that the design of the

2    Phase II funnel has acquired secondary meaning.[6]  Significantly, the Phase II funnel that is

3    also available from other of Cal Labs' distributors is not even marked to identify "Cal Pacific

4    Labs" as the source. Lateef Decl. Ex. 5 at 45:25-46:12 and 50:12-50:15.  In fact, Cal Labs

5    has not produced any evidence that before 1999, when Nalge commenced sales of the Phase

6    III funnel, the Phase II funnel was even identified as having an association with *any single*

7    *source*, let alone Cal Labs.

8    If anything, Cal Labs has engendered consumer identification of the Phase II funnel to

9    Nalge because Cal Labs promoted the Phase II funnel as a Nalge product. Lateef Decl. Ex. 5

10   at 24:14-15.  For example, Dr. Najafi admitted that "several" articles were published on the

11   Phase II funnel. Lateef Decl. Ex. 5 at 24:2-4.  Whether or not Dr. Najafi or another Cal Labs

12   representative may have written these articles, Dr. Najafi testified that he not only allowed,

13   but encouraged, Nalge to publish such articles as being authored by Nalge employees. *Id.* at

14   23:9-16.  Indeed, even an article about the Phase II funnel authored by Dr. Najafi "was

15   written to promote Nalge . . . ." *Id.* 24:2-4.  These articles were published in journals whose

16   readers would be most likely to purchase the Phase II funnel and similar products, i.e.,

17   consumers.

18   Additionally, multiple companies distribute the Phase II funnel. Lateef Decl. Ex. 5 at

19   49:8-19 and Ex. 17 at 1.  Yet, none of the funnels distributed by these companies is marked

20   with a "California Pacific Labs" label, nor with the words "Eco-Funnel." Id. Ex. 5 at 45:25-

21   46:12 and 50:12-15.  Thus, consumers identify the funnels by the distributors from whom

22   they are purchased. *See* Lateef Ex. 15.  "When a product shape or design is sold by the

23   authority of plaintiff under several different word marks, it is more difficult for plaintiff to

24   prove acquisition of secondary meaning—that is, that the shape or design identifies a *single*

25   

26      [6]    Declarations of Dr. Najafi's friends and business associates carry *de minimis*
     evidentiary weight in determining whether the trade dress has acquired secondary meaning
27   because such "[a]ttestations...do not reflect the views of the purchasing public." *Self-*
     *Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th
28   Cir. 1995).

1  source." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:14
2  (4th ed. 2002). "'The use of private labeling undermines a claim that a product's appearance
3  denotes its source, because consumers will be less likely to associate the multifariously
4  labeled product with a single source.'" *See STX, Inc. v. Bauer USA*, 43 U.S.P.Q.2d 1492,
5  1501, 1997 U.S. Dist. LEXIS 16250 (N.D. Cal. 1997) (quoting *Versa Prods. Co. v. Bifold
6  Co.*, 50 F.3d 189, 216 (3d Cir. 1995)). The fact that multiple companies distributed the Phase
7  II funnel under different labels makes it even less likely that consumers will identify the
8  Phase II funnel as coming from Cal Labs.

9      None of Cal Labs' advertising demonstrates an attempt to "engender consumer
10 identification" of the design with any source. Instead, Cal Labs touts the Phase II funnel's
11 functional features to constitute the actual benefit that the consumer wishes to purchase, as
12 distinguished from an assurance that [Cal Labs] made, sponsored, or endorsed the [Phase II
13 funnel]. *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987). Indeed, Cal
14 Labs' promotions engendered consumer identification with Nalge if with anyone. This
15 promotion of the Nalge brand essentially acts as a waiver of any trade dress rights Cal Labs'
16 had. Consequently, the Phase II funnel has not acquired any secondary meaning and is not
17 protectable. *Wal-Mart*, 529 U.S. at 216.

18 **C.    The Phase II Funnel Is Not Likely to Be Confused With Nalge's Nalgene® Safety**
19 **Waste Funnel (Phase III)**

20     Even if the Court were to find that the Phase II funnel has acquired secondary
21 meaning attributable to Cal Labs, Cal Labs bears the burden to prove that there exists a
22 likelihood of confusion. *See Wal-Mart*, 529 U.S. at 209; *Clicks Billiards*, 251 F.3d at 1257-
23 58; *Int'l Jensen*, 4 F.3d at 823. There is no likelihood of confusion in this case. To determine
24 whether there is likelihood of confusion for trade dress, the Court must examine the "total
25 effect of the defendant's product and package on the eye and mind of an ordinary purchaser,"
26 considering such factors as the strength of the trade dress, the similarity of the trade dress,
27 and evidence of actual confusion. *First Brands*, 809 F.2d at 1383-84.

28 ///

1    As set forth in Section V.B., *supra*, the trade dress of the Phase II funnel, if even

2    protectable at all, still fails as a source identifier.  Consequently, this factor, the strength of

3    Cal Labs' trade dress, weighs in favor of Nalge.

4    Additionally, the lack of similarity of the Phase II funnel and the Phase III funnel

5    (both sold as the Nalgene® Safety Waste Funnel) weighs in favor of Nalge.  Consumers are

6    not likely to confuse the Phase II and Phase III funnels since a side-by-side comparison of

7    respective funnel designs clearly shows that the two products are functionally distinct and

8    distinguishable in design from each other.   The Phase III Nalgene® Safety Waste Funnel is

9    visually distinguishable in appearance from the Phase II funnel in having a much shorter

10   stem, a filter extending from the neck of the funnel, and a different shaped lid.  *Compare*

11   Reagan Exs. 6 and 7.

12   Also, the differences in the labels are sufficient for a finding of no likelihood of

13   confusion.  *Leatherman*, 199 F.3d at 1014.   Nalge's funnel is clearly marked with the

14   Nalgene® Safety Waste Funnel label on it.  Reagan Decl. ¶¶ 9, 14.   In fact, Cal Labs

15   endorsed that distinctive label. Lateef Decl. Ex. 5 at 23:8-24:4.  On the other hand, the Phase

16   II funnel has never been marked with the words "Eco-Funnel" or "California Pacific Labs."

17   Lateef. Decl. Ex. 5 at 45:25-46:12 and 50:12-50:15.  "[P]roper labeling will usually preclude

18   confusion." *Tveter v. Ab Turn-o-Matic*, 633 F.2d 831, 838 (9th Cir. 1980) (citing *Bose Corp.*

19   *v. Linear Design Labs, Inc.*, 467 F.2d 304, 310 (2d Cir. 1972) ("there is hardly likelihood of

20   confusion or palming off when the name of the manufacturer is clearly displayed")).

21   Moreover, the Supreme Court in *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225,

22   231 (1964) held that a competitor can copy and produce another's product (absent patent

23   protection) so long as it clearly labels the product as its own. *See also Fisher Stoves, Inc. v.*

24   *All Nighter Stove Works, Inc.*, 626 F.2d 193, 194-95 (1st Cir. 1980); *Bose Corp.*, 467 F.2d at

25   309-10.

26   In *Bose*, for instance, the defendant essentially copied plaintiff's pentagonal stereo

27   speaker housing.  467 F.2d at 309-10.  After finding that the defendant's name appeared on

28   the speakers, on the cartons in which the speakers are shipped, and on all promotional

1   materials, the court denied plaintiff's request for relief under Section 43(a) of the Lanham

2   Act. *Id.*; *see also Fisher Stoves*, 626 F.2d at 194 (name and logo "prominently" displayed on

3   the stove door).

4        Finally, the declarations offered by friends and business associates of Cal Labs

5   demonstrate clearly that there was no actual confusion that Nalge was the source of the

6   Nalgene® Safety Waste Funnel. The declarants' expressed outrage — that Nalge is allegedly

7   "stealing" the "Eco-Funnel" <u>invention</u> — is based on the Phase II and Phase III products

8   being similar in appearance, as opposed to being from the same source. Likelihood of

9   confusion as to <u>source</u>, however, is the relevant inquiry under trade dress law. 15 U.S.C. §

10  1125(a). Plaintiff's declarants merely state what was already apparent — that the Phase II

11  funnel and Nalge's Phase III funnel may look somewhat alike — but this adds nothing on the

12  issue of likelihood of source confusion. *See Sunbeam Corp. v. Equity Indus. Corp.*, 635 F.

13  Supp. 625, 633 (E.D. Va. 1986). Consequently, the factor of lack of actual confusion weighs

14  in favor of Nalge.

15       Overall, Cal Labs' alleged trade dress in the Phase II funnel is not a source identifier.

16  Moreover, any trade dress in the Phase II funnel is not similar to that of the Phase III funnel

17  because of significant differences in appearance and the Nalge product being labeled as the

18  Nalgene® Safety Waste Funnel. Finally, Cal Labs cannot show a likelihood of confusion.

19  Accordingly, the Court should dismiss Cal Labs' trade dress claim in its entirety.

20               VI. **CAL LABS HAS NO PROTECTABLE TRADE SECRETS**

21       Cal Labs has accused Nalge of misappropriating trade secrets. Complaint ¶¶ 66-78.

22  To establish misappropriation of a trade secret under California Civil Code Section 3426, et

23  seq., "it must be shown that a defendant has been unjustly enriched by the improper

24  appropriation, use or disclosure of a 'trade secret.'" *MAI Sys. Corp. v. Peak Computer, Inc.*,

25  991 F.2d 511, 520 (9th Cir. 1993). However, the public at large remains free to discover and

26  exploit any trade secret through reverse engineering of products in the public domain or by

27  independent creation. *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 490, 94 S. Ct. 1879,

28  1890 (1974). Again, Cal Labs bears the burden of proving the existence and protectability of

1    its alleged trade secrets. *MAI Sys. Corp.*, 991 F.2d at 522. Here, Cal Labs has placed most of

2    its alleged trade secrets in the public domain or has failed to show how any of its alleged

3    trade secrets were misappropriated.

4    **A.    Many of Cal Labs' Alleged Trade Secrets Are in the Public Domain**

5            To be a protectable trade secret, information may not be "generally known to the

6    public or to other persons who can obtain economic value from its disclosure" and must be

7    "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

8    Cal. Civ. Code § 3426.1(d)(1). A plaintiff seeking relief for misappropriation of trade secrets

9    "must identify the trade secrets and carry the burden of showing that they exist." *Mai Sys.*

10   *Corp.*, 991 F.2d at 522.

11           Here, Cal Labs asserted the following as alleged trade secrets: (1) All design

12   modifications and features that resulted in the "Eco-Funnel," including the internal particular

13   screen, the shape of the bowl and lid, the color of the bowl, and lid; the latches, gaskets, and

14   closure valves and anti-"burping" features; (2) distributor and customer lists; target customers

15   lists; customer and market research; (3) procedures for accurately measuring evaporation

16   rates; and (4) a prototype suitable for injection molding. Lateef Decl. Ex. 17 at p. 6, ll. 5-18.

17           Cal Labs has produced no evidence showing how the information was not generally

18   known, what steps it took to maintain the secrecy of the information or how any of alleged

19   trade secrets were allegedly misappropriated. In fact, Cal Labs did not take reasonable steps

20   to keep the information secret. Cal Labs displayed the "Eco-Funnel" at trade shows and

21   offered it for sale to the public. *See VSL Corp. v. Gen. Techs., Inc.*, 44 U.S.P.Q.2d 1301,

22   1997 U.S. Dist. LEXIS 22457, *6-7 (N.D. Cal. July 21, 1997). According to Dr. Najafi:

23               Following the final design and manufacturing of the Eco-Funnel, [Cal Labs]
                 spent an enormous amount of time and energy marketing the funnel. For
24               example, [Cal Labs] attended trade shows, made presentation [sic] at the bi-
                 annual conferences of the American Chemical Society, and advertised the
25               product in various professional journals . . . [Dr. Najafi] also published
                 articles on the Eco-Funnel and its benefits in the Occupational Health Journal
26               and Safety Magazine.

27   Lateef Decl. Ex. 3 ¶ 19; *see also* Reagan Decl. Ex. 8.

28   / / /

1    According to Milgrim, "it is an almost undisputed proposition that when an article, the

2    'secret' nature of which is fathomable upon scrutiny and inspection, is marketed, the 'secret'

3    is lost." 1 Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.05[2] (2002). Here, the design

4    modifications and features of the "Eco-Funnel" are revealed by the design of the funnel, that

5    is, one looking at the funnel could easily discern the design aspects Cal Labs alleges are trade

6    secrets.    Because the "Eco-Funnel" was displayed at trade shows, explained in

7    advertisements, and actually sold in the marketplace before Dr. Najafi even met with Nalge

8    representatives and long before Nalge's allegedly infringing Nalgene® Safety Waste Funnel

9    (Lateef Decl. Ex. 3 ¶ 19) was ever sold, these design modifications had lost any trade secret

10   status they might have had. *See Stilwell Dev., Inc. v. Chen*, 11 U.S.P.Q.2d 1328, 1331, 1989

11   U.S. Dist. LEXIS 5971, *11 (C.D. Cal. 1989) ("functional features of the SleepSafe device

12   were not trade secrets since a device incorporating those features had been sold to the general

13   public before it was shown to Southwest") (citing *Acuson Corp. v. Aloka Co.*, 257 Cal. Rptr.

14   368, 374-76 (Cal. App. 1989) (plaintiff's confidentiality arrangements with employees and

15   distributors could not overcome the fact that the trade secret status was lost upon marketing

16   where the alleged trade secrets were readily discernible from disassembly, it being a

17   purchaser's right to disassemble)).[7]

18   Additionally, "disclosure of a trade secret in a patent places the information

19   comprising the secret into the public domain." *Stutz Motor Car of Am., Inc. v. Reebok Int'l,*

20   *Ltd.*, 909 F. Supp. 1353, 1359 (C.D. Cal. 1995) (citing *Rototron Corp. v. Lake Shore Burial*

21   *Vault Co.*, 712 F.2d 1214, 1215 (7th Cir. 1983). The '892 patent, issued May 14, 1996 to Dr.

22   Najafi et al., entitled "Ecological Funnel," discloses a number of the design elements of the

23   "Eco-Funnel." Specifically, the '892 patent discusses a funnel with a lid. Lateef Decl. Ex. 1

24   at Abstract, col. 2:25-29, (4:44-53), Figs. 2A-5A. The patent also discloses that the body of

25   / / /

26

27       [7]   Here, Cal Labs has not provided any evidence of confidentiality agreements
      with any of the engineers, designers, independent contractors and designers that collaborated
28    with Cal Labs. Lateef Decl. Ex. 6 at 20:7 – 22:8.

1    the funnel has generally parallel sides with a tapered bottom, giving the funnel a bowl-ish

2    shape. *Id.* at col. 8:2-4.

3        As to the Phase II funnel, it has been sold by Nalge and four other distributors since

4    1997, and obviously cannot represent any trade secrets as to its configuration. "Once trade

5    secrets have been exposed to the public, they cannot later be recalled." *Religious Tech. Ctr.*

6    *v. Netcom On-Line Comm. Serv., Inc.*, 923 F. Supp. 1231, 1254 (N.D. Cal. 1995) (citations

7    omitted). Accordingly, there is no genuine issue of material fact and Nalge's Motion for

8    Summary Judgment as to the trade secret claim should be granted.

9    **B.**    **Cal Labs Cannot Prove That It Has Any Protectable Trade Secrets**

10        As for the remaining alleged trade secrets — distributor, customer, and target

11    customer lists, procedures for accurately measuring evaporation rates, and a prototype

12    suitable for injection molding — Cal Labs has neither identified which distributors,

13    customers, or target customer lists were disclosed to Nalge, how they were secret, nor how

14    they were misappropriated by Nalge.

15        The same is true of the "procedures for accurately measuring evaporation rates, and a

16    prototype suitable for injection molding." Cal Labs is silent on identifying documents or

17    conversations relating to them, how such items were kept secret by Cal Labs, how these

18    alleged trade secrets were disclosed to Nalge, and how they were misappropriated thereafter

19    by Nalge. It is Cal Labs' burden to prove both the existence and protectability of its alleged

20    trade secrets. *MAI Sys. Corp.*, 991 F.2d at 522. It has done neither. The record before the

21    Court contains no evidence of trade secrets.[8] Therefore, there is no genuine issue of material

22    fact, and Nalge's Motion for Summary Judgment should be granted.

23                  **VII. CONCLUSION**

24        As discussed above, the undisputed facts demonstrate that (1) the Term Sheet was not

25    a valid, enforceable contract, (2) Cal Labs had no protectable trade dress in the Phase II

26

27        [8]    Because Cal Labs cannot prove the existence of any protectable trade secrets

28    or its misappropriation, Cal Labs cannot prove any breach of a confidentiality agreement.

1   funnel and (3) Cal Labs had no protectable trade secrets in either the Phase I (Eco-Funnel)

2   funnel or the Phase II funnel.   Accordingly, Nalge did not (1) breach any contract, (2)

3   infringe Cal Labs' trade dress, or (3) misappropriate Cal Labs' trade secrets.   This Court

4   should enter summary judgment in favor of Nalge.

5

6                                              KNOBBE, MARTENS, OLSON & BEAR, LLP

7

8   Dated: 28 April 2003                    By: _____
                                               Thomas F. Smegal, Jr.
9                                              Irfan A. Lateef
                                               Attorneys for Defendants, NALGE NUNC
10                                             INTERNATIONAL CORPORATION and
                                               APOGENT TECHNOLOGIES, INC.
11
    APOGL.007L
    H:\DOCS\MXF\MXF-1228 REV 3.DOC:///df
12  042503
    [MXF-1228] /// [TFS-1282]
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I am a citizen of the United States of America and I am employed in Irvine, California. I am over the age of 18 and not a party to the within action. My business address is 2040 Main Street, Fourteenth Floor, Irvine, California 92614.

On April 28, 2003, I served the within **Defendants' Notice of Motion and Motion for Summary Judgment Dismissing Plaintiff's Trade Dress, Breach of Contract, and Trade Secret Misappropriation Claims** on the parties or their counsel shown below as follows:

Via efiling to:

> I. Braun Degenshein
> 81 Skyway Lane
> Oakland, CA 94619
> Telephone; (510) 553-9669
> Facsimile: (510) 633-1900
> braun@idblaw.com

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 28, 2003 at Irvine, California.

Shirley Del Rosario
Shirley Del Rosario

APOGL.007L
H:\DOCS\MXF\MXF-1228 REV 3.DOC:///df
042503
[MXF-1228] /// [TFS-1282]