1  I Braun Degenshein (SBN 138832)
Attorney at Law
2  81 Skyway Lane
Oakland, CA 94619
3  510-553-9669 (voice)
510-633-1900 (facsimile)
4
Attorneys for Plaintiff
5  CALIFORNIA PACIFIC LABS, INC.

6

7

8              **UNITED STATES DISTRICT COURT**

9       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                  **SAN JOSE DIVISION**

11

| | |
|---|---|
| 12 CALIFORNIA PACIFIC LABS, INC., a California corporation | Case No.: C 02-01418 JF |
| 13  Plaintiff, | **DECLARATION OF RON NAJAFI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 14 vs. | |
| 15 NALGE NUNC INTERNATIONAL CORPORATION, a Delaware Corporation; and APOGENT TECHNOLOGIES, Inc. | Date:       June 2, 2003<br>Time:       9:00 a.m.<br>Place:      Courtroom 3<br>Before:   Hon. Jeremy Fogel |
| 17  Defendants | |

18

19

I, Ron Najafi, hereby declare as follows:

20  1.      I am the president and majority shareholder of plaintiff California Pacific Labs, Inc.  I am

21  competent to testify to the facts stated herein, and will do so if asked.

22  2.      I have a Bachelor of Arts degree in Chemistry from the University of San Francisco, and

23  a Ph.D. in chemistry from the University of California, Davis.  I am a practicing research chemist

24  and have years of practical, hands-on laboratory experience.  I have taken post-graduate courses

25  in ABI 373 DNA Sequencing, Methods and Strategies in Heteroaromatic Metallation, Drug and

26  Chemical Development and pharmaceutical solids.

27

28

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669

1  3.      I also have been an associate instructor and teaching assistant in Advanced Organic

2  Synthesis, Organic Chemistry Laboratory Studies, and a lecturer in General Chemistry, at both

3  the University of San Francisco and at the University of California at Davis.

4  4.      My professional honors include, but are not limited to, the Perkin-Elmer President's

5  Award for Innovative Discoveries in Chemistry and the Chemical Society Award for

6  Outstanding Achievement in Chemistry.  Also, I was the recipient of the University of

7  California's Campus-Wide Teaching Award for Outstanding Graduate Students in 1988.

8  5.      I have published or co-published more than twelve academic and/or professional articles

9  and abstracts.

10  6.      I was employed as a Senior Development Chemist for the Aldrich Chemical Company, as

11  a Research Scientist for the Rhone-Poulenc Rorer Pharmaceutical Department of Chemical

12  Process Research and Development and a Research Scientist for the Applied Biosystems'

13  Division of Perkin-Elmer Corporation in Foster City, California.

14  7.      During my years in study, as a research scientist and a as a teacher and lecturer, I became

15  personally aware of the impact of chemicals and emissions or evaporation of toxic and

16  flammable compounds on the environment.  In many cases I personally observed chemistry

17  researchers in public or private universities, institutions and companies dumping chemical waste

18  solvents and other toxic materials down the drain.  Around eighty percent (80%) of such

19  chemicals were very dangerous Organic solvents.

20  8.      Additionally, if such solvents and toxic materials were not dumped directly down the

21  drain, they were collected for disposal or removal in containers that virtually always remained

22  open during the day.  In the vast majority of cases, the bottle remained open for until full, thus

23  causing exposure of toxic vapors into the environment and potentially affecting the health of the

24  chemists and neighbors.

25  9.      I also personally experienced health and environmental inspectors who, when visiting our

26  labs, continually complained about the lack of chemists' compliance with the Clean Air Act.

27  Chemists and their supervisors, though, fought for leaving the bottles open as it was too

28

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669

1   inconvenient to remove caps, place funnels, remove funnels and replace caps each time a

2   researcher or assistant needed to dispose of some waste.

3   10.     Based on my first hand observations in laboratories, I engaged in numerous and lengthy

4   evaporation level, market need and feasibility studies.  After hundreds of hours and hundreds of

5   thousands of dollars of such research and development, I invented the patented Eco Funnel.

6   11.     One of the advantages of the Eco Funnel was that it was a closed system that allowed the

7   sealing of vapors in a waste container with an easy to open and close lid.  There was nothing

8   novel about the funnel shape or lid.  The Eco Funnel's patent claims were based on a novel ball

9   that was attached to the lid that occluded the mouth of the funnel stem so no vapors could enter

10  the funnel when closed.

11  12.  Thus, the Eco Funnel satisfied the requirements of all major regulatory agencies including

12  the EPA, OSHA and the FDA.  Also, since no flammable solvents could be released through

13  evaporation, the chance of fire in the laboratory was greatly reduced.

14  13.     Several prototypes of the Eco Funnel were built and tested.  The obvious design of

15  having a closed system with a lid, and air return, did not work to abate evaporation.  Finally, I

16  determined that lengthening the funnel stem so it was immersed in the fluid reduced evaporation

17  to one percent (1%) in ninety days.

18  14.     Following the final design and manufacturing of the Eco Funnel, we spent an enourcous

19  amount of time and energy marketing the funnel.  For example, we attended trade shows, made

20  presentations at the bi-annual conferences of the American Chemical Society and advertised the

21  product in various professional journals as well as creating our own brochure.  I also published

22  articles on the Eco Funnel and its benefits in the Occupational Health Journal and Safety

23  Magazine.  It was our intention to create the widest possible marketing base and collect a

24  database of customers for our new product.

25  15.     Our energy and funds spent on designing and marketing the Eco Funnel paid off as we

26  were able to enter into agreements with some of the largest distributors in the United States,

27  including Nalge Nunc, Aldrich Chemical Co., Lab Safety Supply and Chemglass, Inc.  In fact,

28  our product was so unique and valuable that Chemglass carried it even though it was not made of

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669

1   glass.  True and correct copies of representative pages from these distributors' 1998 to 2003

2   catalogs are attached hereto as *Exhibit A*.

3   16.     In addition to distribution from the above, we also sold our Eco Funnels directly to Merck

4   Pharmaceuticals, Kodak, Inc., Genentech Pharmaceuticals, Purdue University, Scripps Research,

5   Yale University and the University of California, among numerous other academic and

6   commercial customers.

7   17.     After Peter Skapriwsky, Nalge's Marketing Manager saw the Eco Funnel at June, 1996

8   trade conference, he expressed interest in having Nalge distribute the product.  He invited me to

9   Rochester to present the product to Nalge.

10  18.     Before I would make any presentations or reveal any information, however, I was careful

11  to enter into a Confidentiality Agreement.  I was extremely concerned that if I disclosed my

12  information to the world's largest manufacturer of plastic labware that they would simply steal

13  my ideas and put me out of business.  I made my concerns abundantly clear to Peter and to other

14  at Nalge, and as a result Nalge agreed to a Confidentiality Agreement that I drafted and they

15  amended.  (A copy of that agreement is attached to Irfan Lateef's declaration at Exhibit 8.)

16  19.     After Nalge agreed to respect the value of my information, I disclosed substantial

17  information to them far in excess of anything I may have disclosed publicly.  These included all

18  of my research, development and marketing findings in detail.

19  20.     Thus, the information disclosed included information about the numerous prototypes that

20  I created before and after I obtained my patent for my first Eco Funnel in 1996.  Because conical

21  funnels are and were so common, it also included information relating to one of my primary, post

22  patent filing objectives: to create a product that performed the function but that was uniquely

23  designed for product identification purposes.  Also, because it was common to manufacture

24  funnels in the generic color of the plastic used (it was cheaper), I decided to color the lid red as a

25  source identifying feature.

26  21.     This partnership eventually resulted in the "Phase II" funnel that I designed and licensed

27  to Nalge Nunc for its exclusive distribution.  They eventually were marketed by Nalge with

28  catalog numbers starting in 6375, and as part of a system using catalog numbers starting in 6378.

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669

**Declaration of Ron Najafi in Opposition to Defendants'**
**Motion for Summary Judgment – Page 4**

1  Because they were afraid to commit to the costs of tooling up for the product itself, they asked

2  me to have the product manufactured.  This was highly unusual, because I am not a manufacturer

3  at all.  I simply am an inventor.  However, I agreed to do so with the understanding that Nalge

4  eventually would take over manufacturing and pay me a royalty on its Eco Funnel sales.

5  22.      In light of the above, on March 4, 1997 I entered into a Purchasing Agreement with

6  Nalge.  (A copy of that Agreement is attached to Irfan Lateef's declaration at Exhibit 6).

7  However, because I am not a manufacturer, I needed advance payment for the products ordered

8  per that agreement.  Consequently, we amended the Purchasing Agreement on September 22,

9  1997 to memorialize that Nalge agreed to prepay for the first year's shipment of products.  A true

10  and correct copy of that amendment is attached hereto as *Exhibit B.*

11  23.      Contrary to Nalge's assertions, and as stated above, Nalge had nothing to do with the

12  physical design of the product of the Phase II Eco Funnel.  In fact, I developed the Phase II Eco

13  Funnel in 1995 and 1996 before I ever did business with Nalge.  A true and correct copy of a

14  January 30, 1996 three page engineering drawing of the Phase II funnel is attached hereto as

15  *Exhibit C*.  The drawings are marked "CONFIDENTIAL" and signed and dated by the owner of

16  Dynaform Company who eventually manufactured the product for me.  I disclosed these

17  drawings to Nalge pursuant to the terms of our Confidentiality Agreement.

18  24.      Similarly, while it is true that I discussed the idea of using a red colored lid with Nalge, it

19  was not Nalge's idea and it had nothing to do with functionality.  Other lidded funnels were

20  coming out on the market, and they all had white lids.  I wanted my Eco Funnels to stand out

21  from the others so that it could be easily identified at first glance as Eco Funnel product.

22  Therefore, I chose the red lid and the particular bowl shape of the funnel.

23  25.      As it turns out, neither was a very cost effective or functional feature.  Purchasers have

24  told me that they mistakenly poured liquid into the recessed red lid in dim light because they

25  thought the lid was open.  Additionally, a traditional, conically shaped funnel would better serve

26  more viscous fluids that tend to stick to the Eco Funnels' gentle slope. Also, a Phase II funnel

27  would not be suited for use with an occluding ball.

28

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669

**Declaration of Ron Najafi in Opposition to Defendants'**
**Motion for Summary Judgment – Page 5**

26.     As I said above, during the course of my dealings with Nalge I disclosed a plethora of confidential information that was so marked.  Unfortunately, I have not yet been able to locate my copies of all of those documents, but I am sure Nalge must still have them with its ISO 9001 system requirements.  In any event, true and correct copies of such pages marked "CONFIDENTIAL" that I did recently locate are attached hereto as *Exhibit D*.  As you can see, these pages disclosed parts of the shape of the Phase II Eco Funnel as well as research information.

27.      Nalge's version of my Eco Funnel is far inferior to mine for several reasons:

      a.     The PTFE filter that Nalge uses does not trap toxic organic vapors.  They are prone to clogging and once clogged, in practice, they are discarded without being replaced.  This leaves a vent open at all times to the atmosphere.

      b.     Nalge's funnel does not have a long stem that extends into the waste fluid, resulting in nearly 80% more evaporation into the atmosphere than my Eco Funnels.

      c.     Nalge's vent is at the very bottom of the funnel.  If my design Eco Funnel is overfilled, the fluid will not leak into the atmosphere; if Nalge's funnel is overfilled with a substance like benzene, the benzene will shoot out the filter hole.

28.     I continue to market my Eco Funnels at various trade conferences and show.  Not a day will go by without someone walking up to my booth complaining about my Eco Funnel.  Each time, after engaging them in conversation, I was able to determine that they were actually talking about Nalge's inferior competing product.  Examples of such confusion witnesses were disclosed to Nalge a long time ago in our responses to their interrogatories.

29.     Nalge's assertions about the "integration clause" in its purchasing order are ridiculous and insulting.  Had I any idea that they were going to claim the purchasing orders invalidated out previous agreements, I would not have accepted them.

30.     In fact, I have no recollection of even seeing one of their purchase orders.  California Pacific Labs customarily keeps purchase orders in the files of the people who send them, and diligently and repeatedly searching my files, I cannot find any from Nalge.  My only recollection is that they verbally gave me purchase order numbers to which I had to refer on my invoices.

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669

**Declaration of Ron Najafi in Opposition to Defendants'**
**Motion for Summary Judgment – Page 6**

31.     Additionally, in practice most purchasers fax purchase orders, so I never get to see the back of them.  In any event, how is it that Nalge's first purchase order cancelled out our Purchasing Agreement if they agreed to amend the Purchasing Agreement *after* that first purchase order?

32.     The photograph on Exhibit B of Braun Degenshein's declaration is a photograph of my Phase II Eco Funnels (6375 funnels). Beside the fact that I know when this photograph was first used, I can tell that they are my Eco Funnels because they show a long stem on the funnel on the right.

33.     Attached hereto as *Exhibit E* is a true and correct copy of a "sell sheet" prepared by Nalge for its current Eco Funnel that I obtained through the normal course of business.

34.     Attached hereto as *Exhibit F* are true and correct copies of catalog pages and photographs of actual funnels showing the variety of shapes available to funnels.

34.     Since August of 2001, our sales have gradually and now dramatically declined.  As of February, 2002, we have lost eighty percent (80%) of our market for the Eco Funnel.  Nalge's misappropriation of our information is putting us out of business.  This is extremely distressing because California Pacific Labs and Nalge are the only manufacturers of safety waste funnels.  It is all the more distressing because when you conduct a simple "Google" search for "Eco Funnel" or "Ecological Funnel," far more results are returned than for searches for "Safety Waste Funnel" or "Safety Waste System."

35.  Attached hereto as *Exhibit G* is a true and correct copy of a product brochure that I prepared for release simultaneous to Nalge's release of our Phase II Eco Funnels.  We used this brochure with the three distributors we reserved in the Purchasing Agreement, and for our own marketing of the Phase II funnel.  As you can see, we clearly branded our Eco Funnels that we did not sell through Nalge.  We touted the improved safety of the Phase II over the Phase I funnel solely because the Phase I funnel used mechanical welds that were prone to failure.  We could just as easily have made the Phase II funnel look exactly like the Phase I funnel, but without mechanical welds.  Moreover, you can see from the brochure, we made efforts to specifically brand the very

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669

1    shape of the Phase II Eco Funnel by using that shape in our Eco Funnel "Keep the Genie in the

2    Bottle" logo.

3         I swear under penalty of perjury under the laws of the United States that the foregoing is

4    true and correct and of my own personal knowledge.

5    **Dated:**  May 10, 2003

6                                             /s/ Ron Najafi, Ph.D.

7                                             _____

8                                             Ron Najafi, Ph.D.

9         I hereby attest that concurrence in the filing of this document has been obtained from the

10   above signing party.

11                                            /s/ I Braun Degenshein

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669

1  I Braun Degenshein (SBN 138832)
   Attorney at Law
2  81 Skyway Lane
   Oakland, CA 94619
3  510-553-9669 (voice)
   510-633-1900 (facsimile)
4
   Attorneys for Plaintiff
5  CALIFORNIA PACIFIC LABS, INC.

6

7

8                  **UNITED STATES DISTRICT COURT**

9            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                       **SAN JOSE DIVISION**

11

12  CALIFORNIA PACIFIC LABS, INC., a          Case No.: C 02-01418 JF
    California corporation
13                                            **NOTICE REGARDING EXHIBIT**
               Plaintiff,                     **ATTACHMENT**
14
               vs.                            Date:       June 2, 2003
15                                            Time:       9:00 a.m.
    NALGE NUNC INTERNATIONAL                  Place:      Courtroom 3
16  CORPORATION, a Delaware Corporation;      Before:     Hon. Jeremy Fogel
    and APOGENT TECHNOLOGIES, Inc.
17
               Defendants
18

19
                  **NOTICE REGARDING EXHIBIT ATTACHMENT**
20
            Exhibits A through F which are attachments to the Declaration of Ron Najafi, Ph.D. in
21
    Opposition to Defendants' Motion for Summary Judgment are in paper form only and are being
22
    maintained in the case file in the Clerk's office.
23
            The reason for manual filing is because the file size with all exhibits scanned is too large
24
    to be transmitted electronically.
25
    **Dated:**  May 12, 2003
26
                                            /s/  I Braun Degenshein
27
                                            Attorney for Plaintiff
28

I Braun Degenshein
Attorney at Law
81 Skyway Lane
Oakland, CA 94619
510-553-9669